HERMAN EBERT v. NS II. MYERS and OLIVIA MYERS, Appellants.—9 S.
W. (2d) 1066.

Division Two, July 20, 1928.

*W. W. Bolls* for appellants.

*Rodgers & Buffington* for respondent.

WHITE, P. J.—The plaintiff brought this suit to set aside a conveyance by Ns Myers to his daughter, Olivia Myers, as in fraud of creditors.

The petition alleges that Ns Myers became indebted to plaintiff in July, 1915, in the sum of $575.70, and executed his note therefor; that August 4, 1924, plaintiff brought suit and later recovered judgment against the defendant Ns Myers in Audrain County Circuit Court for the debt and interest, amounting to $1001.31; that February 19, 1923, the defendant, Ns Myers, conveyed to his daughter Olivia Myers, certain real estate, described, in the city of Mexico, Missouri, for a recited consideration of one dollar and other valuable considerations; that in fact such conveyance was voluntary, without consideration, and made for the purpose of delaying and defrauding the creditors of Ns Myers; that by reason of such conveyance Ns Myers rendered himself wholly insolvent.

The defendants answered, admitting the indebtedness to plaintiff, the judgment and the conveyance by Myers to his daughter, but alleged that the conveyance was for a valuable consideration; that Ns Myers owed to her and her brothers and sisters various sums

amounting in all to $4827.67, and that the conveyance was made for the payment of those debts. ,The children to whom those debts were listed were Mrs. Terrell Crews, $1324.27; James R. Myers, $324.47; Clara Le Sheeley, $796.14; Charles L. Myers, $610; Lawrence Q. Myers, $700.05; Martin T. Myers, $217.50, and Olivia Myers, $262.55.

It is alleged that these children of Ns Myers to whom he was indebted requested that he make conveyance, in payment of said debts, of the property described, to Olivia Myers, "as the person to hold the title to said land for their benefit, and surrendered to defendant, Ns Myers, their claims for said debts and look solely to the defendant, Olivia Myers, for the payment thereof, in so far as property will go towards such payment, and have no further claim upon said Ns Myers for said debts."

It is further alleged that the property was the homestead of Ns Myers upon which he and his wife resided, and was not worth the $4287.67, the amount of the debts to the children.

It is further alleged that at the time of 'the said conveyance the said Ns Myers was negotiating for a loan to pay back taxes and money borrowed for the purpose of paying taxes, and February 20, 1923, did execute a deed of·trust for the purpose of procuring money to pay said. back taxes, and said money borrowed for that purpose, and that Olivia Myers and the parties whom she represents knew all said negotiations for said loan and parts thereof, and knew that they were acquiring the property subject to said deed of trust. The deed sought to˙be set aside, although executed the day before the deed of trust, was not filed for record for a year and a half later.

The court rendered judgment March 26, 1925, holding that the conveyance by Ns Myers to Olivia Myers was fraudulent and void .as to the plaintiff, found that the property described was a. homestead of the grantor, of the approximate value of $4500, and adjudged that Ns Myers, under Section 5863, Revised Statutes 1919, should within ten days exercise the option to convey said·property to the plaintiff on payment by plaintiff of $1500, the value of his homestead, or pay the said judgment; otherwise the property should be sold and the proceeds apportioned accordingly. Defendant appealed.

I. In the answer defendants attempt to set up a resulting trust in favor of Olivia Myers, her brothers and sisters, on the ground that the conveyance was made to her by her father in consideration of each of those children cancelling his or her debt, which it is claimed the father owed. It is conceded that there is no written evidence of any agreement of the parties to that effect, and appellant contends that therefore a trust resulted

by operation of law; that Olivia therefore holds the property in trust for her brothers and sisters in proportion to the debt so surrendered, as their several parts of the purchase price.

A resulting trust arises by operation of law from the facts in the case and never by operation of any agreement; from what the parties do, and never what they agree to do. Where an alleged trust must be established by agreement the agreement must be in writing, under Section 2253, Revised Statutes 1919, and it cannot be a resulting trust under Section 2264. [Bender v. Bender, 220 S. W. 929; Thompson v. Thompson, 211 S. W. 52; Heil v. Heil, 184 Mo. 1. c. 675; Price v. Kane, 112 Mo. 412.]

The appellant cites the case of Shelton v. Harrison, 182 Mo. App. 404, as nearest in point. In that case a number of persons entered into an agreement to purchase land for a fruit farm and one Harrison who originated the scheme collected the money from his associates in monthly installments to pay for the land, and purchased the land in his own name. It was held that a trust resulted. Judge STURGIS, who wrote the opinion, reviewed the authorities at length, and quoted (1. c. 417), from Pomeroy on Equity Jurisprudence, as follows:

"All possible trusts, whether of real or personal property, are separated by a principal line of division into two great classes: Those created by the intentional act of some party having dominion over the property, done with the view to the creation of a trust, which are express trusts; those created by operation of law, where the acts of the parties may have had no intentional reference to the existence of any trust—implied, or resulting and constructive trusts."

A resulting trust always arises in favor of a person who furnishes the purchase money for land which is taken in the name of another. It is that principle on which appellant relies.

In the Bender case it was said (1. c. 930): "If a parol agreement providing for a conveyance is resorted to, it at once becomes an express trust, and not a resulting trust, and cannot be established by parol."

In the Price case (1. c. 419), this was said: "The only evidence introduced in the case to establish a trust was that of declarations made by the wife to the effect that the property belonged to her husband, and that she would convey it back to him whenever he wished her to do so. These were declarations of an express trust which could only have been been proved by writing." In the Heil case it was said (1. c. 675-6): "An express active trust is one in which, from the express directions of the language creating *the trust or from the very nature of the trust itself,* the trustee is charged with the performance of active and substantial duties with respect to the

control, management and disposition of the trust property for the benefit of the *cestui que trust."* (Italics ours.)

In view of this state of the law it is necessary to examine the evidence.

The defendant Olivia Myers testified in a deposition introduced by the plaintiff, after describing the execution of the deed which her father made to her, she said:

"Q. Now, who brought the matter up; who spoke first about it? A. It was my sister, Mrs. Sheeley, or Clara. She suggested that I would be the one to deed it to. I can't say whether there had been anything said about it by them before the suggestion that it be deeded to me was made. I think that was the first that I heard about it. The next think I knew about the transaction was that the deed was handed to me. . . .

"Q. Now, what did you say was the agreement or suggestion that your sister made about having the property conveyed to you? A. I said she just suggested that it be made to me.

"Q. Why to you? A. Well, I don't know why to me any more than the rest of them.

"Q. Well, why to anybody? A. Well, to reimburse the ones that had assisted father, who had advanced sums to him at various times.

"Q. Well, what were you to do with it when you got it? A. *You might say to hold it for them.*

"Q. *In what capacity?* A. *As a home.*

"Q. *As a home for your father and mother?* A. *Yes, and any of the other children who wanted to live there. . . .*

"Q. *All right, what did Mrs. Sheeley say?* A. *That my brothers and sisters had agreed that it be made to me as a home for me as well as my father."* . . .

And,

"Q. Now, at the time this talk was had with reference to conveying this property to you, as you say for you and the other children, it was the *understanding between every one of you that you did not expect to and would not put your father and mother out of that home, wasn't it?* A. *Naturally, yes.*

"Q. And it was understood between every one of you that your father and mother's relationship to that home would not be changed one whit so far as living in it; that is correct, isn't it? A. Yes.

"Q. And all your father was doing by reason of this arrangement was simply to pass the title to you for you to hold for you and the other children; that is correct isn't it? A. Well, yes, as long as they wanted it, it was still mine.

"Q. *And the possession and control of that home since the time of this deed has been in your father just the same as it was before any deed was made; that is correct isn't it?* A. *Yes.*"

Lawrence W. Myers, one of the beneficiaries, after describing how the indebtedness of his father to him arose, testified as follows:

"Q. Do you remember of anything in the nature of a conference amongst you children as to what your father should do in regard to securing you or paying you? A. Yes, sir.

"Q. What was it? A. He was to turn the deed over to Olivia. *I don't know whether he was requested to make a deed or not. The ownership of the property from that time on was to go to the unmarried ones of the family. We every one just turned everything we had right over.* . . .

"Q. Now, Lawrence, you say this $200 note is a part of this $700 claim you make, you say your father owes you? A. It is. *No, I have never made any demand on father for payment of the note, nor for the cash or produce, and he has never said anything about paying me. I don't expect to say anything to him about paying it unless he has the money.* No, I expected when I made these advances that he would some time pay me. . . .

"Q. As long as you have anything to say about it, your father and your mother are going to continue out there in that residence just the same now as they have always done, that is correct? A. *That is up to Olivia's part now. I don't claim any interest in the property now. I understood it was conveyed for the single ones. I turned that all over to Olivia. We just turned that all over to her because she is single. After that was all conveyed to her, why that released me.*

"Q. That is just simply an indebtedness you say you hold against your father free and clear of any claims or interest in the property out there? A. No, that all went right in with the property when we turned it over to Olivia.

"Q. And your position is that this claim stands against him, has no connection and you don't claim anything against him by reason of the advancements to him in the property out there? A. No."

Martin T. Myers gave his version of it thus:

"Q. Well, did anybody state to you or you state to anybody what the purpose was to be? You may tell what was said about it? A. We said the purpose was to protect the children, to reimburse us for the amount we had put in, that we had advanced. . . .

"Q. Well, did you and the rest of the children expect as soon as the deed was made to Olivia that they would be put out? A. No, sir.

"Q. *And the purpose of having the title transferred to Olivia was to keep a home there for your father and mother for the rest of their lives, wasn't it?* A. *And any of the children.*

"Q. *And any of the children who wanted to live there with them?* A. *Yes, sir.*

Also,

"Q. Now, Mr. Myers, you said that you had this conveyance made for protection. Protection against whom? A. Well, *to protect our own interests.*

"Q. *Well, I know, but it wasn't to protect you from your father was it?* A. *No, sir.*

"Q. *Well, then to protect you from whom?* A. *I don't know from whom.*

"Q. *Well, it was to protect you from your father's creditors, was it not?* A. *Yes, sir, partially.*

"Q. *And by having it tied up that way you children would get it when your old folks died?* A. *Yes, sir.*

"Q. *And your father and mother were not to be disturbed and could use it as long as they lived?* A. *As long as they wanted it, yes, sir.*"

Mrs. Terrell Crews thus explained it:

"Q. Now, Mrs. Crews, you say Mrs. Sheeley was the first one spoke to you about this conveyance? A. I think she was the first one that mentioned it.

"Q. And what was it she said? A. I don't remember what she said, she just mentioned it in some manner.

"Q. Mentioned what? A. Conveying the property to Olivia to reimburse the children for what they had advanced.

"Q. Well, how did you figure that you were going to be reimbursed in that? A. Well, when the property is sold, I suppose. I suppose I would get out of it what was coming to me.

"Q. But you understood no sale was to take place? A. Nothing was said about that. . . . Well, it was agreed among us that Olivia was to hold the place and then reimburse us, I should think it would make a difference in that way—as long as she knows how much each one of us has advanced we would naturally expect that amount out of the place. . . .

"Q. And you didn't know how this additional benefit, or, if any benefit would accrue by your father conveying it to Olivia than by staying in your father? A. *Except that if it was conveyed to Olivia it was understood that we were to be reimbursed for what we had advanced, we would be sure of that.*

"Q. Well, in substance what did she tell you about any other indebtedness that your father owed? A. She didn't mention any other indebtedness.

"Q. Well, about what he owed any other children, I am talking about? A. She, as well as I remember, said, 'What do you think about having the property put in Olivia's hands to reimburse us?' and I said, 'All right.'

"Q. Well, 'to reimburse us,' what would you understand by that? A. Settle for these advancements."

The evidence further shows that Ns Myers and his wife with the unmarried children continued to live in the place after the conveyance, just as they did before, and controlled it in exactly the same way. This evidence is uncontradicted.

It will be noticed that each of these witnesses, beneficiaries under this arrangement, attempted to avoid stating that there was any express agreement between the parties. But there was an *understanding*. They talked the matter over together. What language was used in those conversations they do not remember, or at least do not state. But it appears conclusive from this evidence that this understanding was that the grantor, Ns Myers, was to remain in possession of the property as long as he desired to stay; that neither one of the beneficiaries claimed any right to immediate possession of the property; that the title was put in the name of Olivia for the preservation of a home for the benefit of the parents and the minor children. As Lawrence Myers said:

"The ownership of the property from that time on was to go to the unmarried ones of the family. We every one just turned everything we had right over."

Others testified that Olivia was to have the property for the protection of all of them; "to reimburse us." Some said that eventually if the property was sold they were to be paid out of the proceeds. Further it was agreed when the deed was executed that it was not to take effect until after the grantor should place a mortgage on it to secure money to pay back taxes.

All of these conditions and understandings between the parties could only come by reason of an agreement. They do not arise by implication of law. The law does not imply that a grantor is to retain possession after a conveyance of that kind. It does not imply that the beneficial interest is to go to a certain portion of those who advanced the purchase money and not to all in proportion to the amount advanced. It does not imply that they are to be paid out of the sale of the land. All of this could only arise by reason of an express agreement and a trust could not result under certain circumstances.

It is not necessary to decide whether the cancellation of debts as consideration for the purchase of the property would be the same as advancing money for its purchase where the title is taken in the name of another. It seemed to be understood by the beneficiaries

here that their debts were not extinguished at the time of the conveyance as alleged in the answer, but were held in abeyance with the possibility of being partially paid in the future. Under the facts in this case no trust resulted and the arrangement was therefore within the statute requiring such trust to be in writing. The conveyance was therefore voidable.

II. Under Section 2275, a deed of gift in trust for the use of the party making such gift or conveyance is void as against creditors. The evidence is uncontradicted by the parties who claim an interest; that the purpose of the transfer of title to Olivia was to keep the home for their father and mother for the rest of their lives, and any of the children who wanted to live there with them. This is a conveyance to the use of the grantor. The evidence shows it did not alter in any way the grantor's position with reference to the property, its management or control. The conveyance was therefore voidable for that reason. [McIlvaine v. Smith, 42 Mo. 45; 27 C. J. 598; McFarland v. Bishop, 282 Mo. 1. c. 551.]

III. The evidence supports the finding of the trial court that the value of the property is more than enough in excess of the $1500 allowed for homestead to cover the judgment of the plaintiff and costs.

The judgment is therefore affirmed. All concur.