CITIZENS BANK OF UNION and BANK OF UNION v. IDA HILKEMEYER, IDA HILKEMEYER as Executrix of Last Will of L. G. HILKEMEYER, and FRANK W. JENNY, Appellants.—29 S. W. (2d) 1090.

Division Two, July 3, 1930.

*Joseph Kane* and *Frank W. Jenny* for appellants.

*James Booth, Virginia Booth, W. L. Cole* and *T. P. Hukriede* for respondents.

COOLEY, C.—This is an appeal from the judgment of the Circuit Court of Franklin County in favor of plaintiffs' setting aside deeds whereby certain residence property in the city of Union, Missouri, owned by L. G. Hilkemeyer, was conveyed to himself and his wife, defendant Ida Hilkemeyer, as tenants by the entirety, upon the ground that the conveyance was in fraud of Hilkemeyer's creditors.

The property consisted of two lots with a residence thereon. At the time of the conveyances involved, Hilkemeyer owned the property and he and his wife (they had no children) occupied it as their residence and homestead, it having been so owned and occupied continuously from a time antedating the origin of any of the debts hereinafter mentioned. On May 8, 1924, Hilkemeyer and wife conveyed the property to Frank W. Jenny, who, on the same day, conveyed it to said L. G. Hilkemeyer and Ida Hilkemeyer, his wife, each conveyance being by warranty deed reciting a consideration of one dollar, which nominal considerations were not in fact paid. Jenny claims no interest, having acted merely as conduit through whom title was passed from Hilkemeyer to Hilkemeyer and wife. Both deeds were at once recorded. Hilkemeyer died testate, March 9, 1926, his wife being sole beneficiary under his will. This suit was filed January 19, 1927, by the two plaintiff banks as existing creditors of Hilkemeyer on May 8, 1924. Ida Hilkemeyer, individually and as executrix of her husband's will, and Jenny were made defendants. The petition charges that at the time of the conveyances Hilkemeyer was insolvent and that the conveyances were without consideration and were made by Hilkemeyer with the intent on his part to put said property beyond the reach of his creditors and to hinder, delay and defraud his creditors, particularly plaintiffs. It is not charged that defendants partici-

pated in or knew of such alleged intent on the part of Hilkemeyer or of his alleged insolvency.

No point is made on this appeal as to the pleadings. The question presented here is the sufficiency of the evidence to justify the judgment setting aside the deeds mentioned. All of the evidence introduced was offered by plaintiffs, the defendants submitting the case upon plaintiffs' evidence. It consisted chiefly of the testimony of the cashiers of plaintiff banks, and a showing of the condition of Hilkemeyer's estate appearing from the records and files in the probate court made in the course of administration of said estate.

The evidence showed the following: At the time of the conveyances, May 8, 1924, Hilkemeyer was obligated to plaintiff Citizens Bank of Union in the aggregate sum of $3,000, represented by six notes, three of $500 each, one of $350, one of $150, and one of $1,000. The $1,000 note was signed by Hilkemeyer alone, the others being signed by other makers and Hilkemeyer, the latter's signature appearing last, he being as between him and his co-makers a surety, though appearing as co-maker. The person whose signature appeared first received the money on each note and paid the interest. Later one of the $500 notes was increased to $540 by the addition of $40 interest, which the party who should have paid was unable to pay at the time. All of these notes were renewed from time to time after May 8, 1924, interest being paid up at each renewal except the $40 above mentioned, and were still owed when Hilkemeyer died. They were allowed as demands against his estate in the aggregate amount of $3167.50, which included interest then earned since last previous renewals.

On the same date, May 8, 1924, Hilkemeyer was obligated to plaintiff Bank of Union in the total sum of $6100, represented by three notes, one of $1,000 and one of $1500, signed by him individually, and one of $3600, signed by William Vondera and Hilkemeyer. Vondera kept up the interest on the last-named note. These three notes to the Bank of Union were renewed from time to time after May 8, 1924. In July, 1925, the $1,000 note was increased to $1600, the increase representing an additional loan. On October 27, 1925, the $3600 note was increased to $3888.45, the increase representing part of the interest then due, which Vondera was unable to pay and which was added to the renewal note made at that time. The notes as thus increased, viz., $1600, $1500 and $3888.45, were owed at Hilkemeyer's death and with interest earned since last renewals were allowed against his estate in the aggregate sum of $7252.

On May 8, 1924, Hilkemeyer owed a $5,000 note secured by deed of trust on his store building and lots and some wholesale bills for merchandise, he being a merchant. The amount of wholesale bills appears only from certain financial statements made by

him to the Bank of Union, at which he did most of his banking business, which will be referred to later. It does not appear that he owed debts other than those above referred to, unless the statements mentioned include others, of which more anon.

At the time of the conveyance Hilkemeyer owned his store building and ground upon which it stood, then worth, according to all the evidence on the subject, $7,000, the above mentioned residence property of the estimated value of $7,000 to $7,500, a large stock of general merchandise in good condition, adequate and good store fixtures and furniture, one or two other small parcels of real estate, worth perhaps $700, had some money in bonds and certificates of deposit in plaintiff banks, and other personal property the nature and amount of which appears only from the documentary and record evidence which we shall refer to presently. He was and had been for at least twelve to fifteen years doing a good business, discounted most of his wholesale bills, was never overdrawn at the bank, and it is not intimated that he engaged in any speculative enterprises. He occasionally, both before and after the conveyance complained of, consulted Mr. Allersmeyer, cashier of the Bank of Union, about his business affairs, and after the conveyance was made seems still to have been considered solvent, as both banks renewed all of the notes upon which he was obligated to them respectively, at least twice, without pressing him for payment or asking for security, although they knew of the transfer of his residence property. Also the Bank of Union loaned him additional money. His holdings remained substantially the same from the time of the conveyance until his death. He habitually paid the interest in advance on his individual notes. No suits were brought against him before his death, and there is nothing in the evidence to indicate that at the time of the conveyance he was considered by any one, or felt himself to be, in embarrassed circumstances financially. He made to the Bank of Union yearly statements showing his financial condition. Plaintiffs introduced three of these in evidence, one Exhibit 13, made December 31, 1923, shortly before the conveyance, another, Exhibit 14, December 31, 1924, and the third, Exhibit 15, December 31, 1925.

Exhibit 13 is as follows:

To Bank of Union. Inv. Dec. 31, 1923. Hilkemeyer

### Assets

| | |
|---|---|
| Real Estate worth | $13,025.00 |
| Stock of Merchandise & Fix. | 28,841.44 |
| Accounts due & not due | 2,618.26 |
| Notes, stocks, bonds, time certificates and Pers prop outside of merchandise | 11,723.47 |
| Total assets | $56,208.17 |

Total liabilities ...................................... 13,792.02

Net Worth ............................................... $42,416.15

### Liabilities

Bills payable on Merchandise ........................ $ 4,292.02
Chattel Mortgages ...................................... 9,500.00

Total Liabilities ...................................... $13,792.02
Fire Insurance on stock ..............................$21,000.00
On Building and Home .............................. 6,500.00
Life Insurance payable to wife ................... 8,000.00

L. G. HILKEMEYER.

It is not clear what is meant by "chattel mortgages" in the listed liabilities in the above statement, since there is no evidence that he owed any debts so secured, and there is no reference to chattel mortgages in the next two annual statements. It may have meant his debts to the banks, or at least have included the $3500 of individual notes he then owed them and on which he naturally considered himself primarily liable. But if we assume, as most favorable to plaintiffs, that all of it was liability other than that to the banks, and add to it the whole of the $9100 upon which he was then obligated to the two banks, and add also the $5,000 note secured by deed of trust, it makes a total of $27,892.02, which, deducted from the total of assets shown, leaves $28,316.15, as the value of his assets above all liabilities. Deduct from that the highest estimate of value put upon the residence property by the witnesses, $7500, and it would still leave him owning, after the conveyance, property of the value of $20,816.15 above his liabilities, assuming values to have remained the same from December 31, 1923, to May 8, 1924.

Exhibit 14 is as follows:

Statement as per Inventory December 31, 1924.

Merchandise on hand as per stock record .. $22,552.17
Fixtures and Delivery Truck ............. 2,371.50
Book account all good ................... 2,183.32
Cash on Hand and in Bank ............. 126.47
Liberty Bonds ........................ 900.00
War Savings Stamps ................... 100.00
Time Certificates of Deposit ............ 4,613.31
5 Shares Farmers & Merchants Mill ...... 500.00
30 Shares Hannibal Rubber Co. .......... 150.00
3 Shares Union Elec. L. & P. Co. .......... 300.00
7 Shares Bank of Union ............... 3,000.00
6 Shares Citizens Bank of Union ........ 1,000.00
1 Nash automobile ..................... 1,300.00
2 Lots & House Robertson Add. .......... 5,500.00

| | | |
|---|---|---|
| Store Building and Lot ................ | 7,500.00 | |
| 1 Lot Shoe Factory Add. ................ | 25.00 | |
| | | $52,121.77 |

Liabilities

| | | |
|---|---|---|
| Owe for merchandise not due .......... | $ 3,699.47 | |
| Note Bank of Union for mdse. ........... | 2,500.00 | |
| Note on real estate..................... | 5,000.00 | |
| Note to J. G. Moutier ................. | 1,000.00 | |
| Note to Wm. Vondea ................. | 1,000.00 | |
| | | $13,198.47 |

Present Worth ................................. $38,923.30

Sales for the year, $52,916.54.

This is a somewhat more detailed statement than Exhibit 13. It includes in the liabilities listed the $5,000 real estate note and at least the $2500 which he then owed the Bank of Union on his individual notes. It evidently does not include the other notes to the banks, upon which he doubtless considered himself only surety. If we add to the total liabilities listed in Exhibit 14 the balance of the notes on which he was obligated to the banks, $6600 ($9100 less $2500), it makes a total indebtedness of $19,798.47 as of December 31, 1924. Deducting that sum from the total assets shown by Exhibit 14, leaves his net worth at that time, $32,323.30, and deducting from that sum the $7500 value of the property transferred to himself and wife would leave him, according to that statement, owning property worth $24,823.30 in excess of his liabilities.

Exhibit 15 shows substantially the same properties as assets, but the valuation of some items is increased and the accounts due are greater. The aggregate value of assets shown is $57,513.25. The liabilities shown are greater in amount, the sum owing for merchandise being $9,941.62, the increase of $600 in his debt to the Bank of Union being shown, and an item, "Note on Mdse. from H & S, $2500," being added. The total of liabilities shown is $22,541.63. Total sales for the year were stated to be $59,092.08. By the same process of figuring as in case of Exhibit 14, he would appear, according to Exhibit 15, to have been worth on December 31, 1925, more than $20,000 above his liabilities, after deducting from his assets the value of the residence property transferred. Exhibit 15 shows among his assets, cash in bank, Liberty bonds and certificates of deposit aggregating $5,387.04.

Following Hilkemeyer's death in March, 1926, letters of administration with will annexed were issued to defendant Ida Hilkemeyer,

who proceeded to administer the estate. The probate judge, Mr. Hoemann, was called and testified, giving the substance of the facts shown by the record and files in his office concerning the estate. The original inventory and appraisement showed personal property of the aggregate value of $28,928.38, and there was a supplemental inventory showing $252.50, making a total of $29,-180.88. Real estate (items not shown) other than the store property and of course not including the residence property, was appraised at $650 in the original appraisement, and there is a "supplemental appraisement" of real estate filed later, showing $150, evidently additional, making total appraised value of real estate available to creditors of $800. The store real estate, though appraised as part of the estate, was later sold under the deed of trust for $5,000, the face amount of the secured debt, leaving nothing in that item for general creditors. The total appraised value of the estate without the store real estate is thus seen to be $29,980.88.

The trial of this case was a little more than a year after Hilkemeyer's death, hence we may assume that all demands against his estate had been presented. The demands presented and allowed against the estate were as follows: Demands assigned to the first class, $613.60; second class, $239.60; third and fourth classes, none; fifth class, $23,724.13; sixth class, $55.60; making total of $24,-632.93, or $5,347.75 less than the appraised value of assets in the hands of the executrix.

Considering the assets worth their appraised value the estate appears solvent. But there were further developments shown which should be noted. The estate was not fully administered, nor all assets reduced to money, at the time this case was tried, but the executrix had made one semi-annual settlement in the probate court which showed that she had paid out $2457.52, and had cash on hand $17,311.80, a total of $19,769.32 realized out of the personal assets in cash up to that time. According to the settlement there remained in the executrix's hands uncollected assets of the appraised value of $5,256.11. The evidence showed that some of this is of small or doubtful value. Mr. Allersmeyer estimated that of the $2862.61 uncollected accounts, $500 would be realized. Stock in a milling company of the par value of $700 was shown to be practically worthless although in 1924 it was shown to have been worth twenty-five cents on the dollar.

No showing other than the statutory appraisement was made as to the value of the other uncollected personal assets, nor of the undisposed of real estate. Assuming that real estate to be of its appraised value, $800, and that $500 will be realized from the uncollected accounts, there will be $1300 to add to the cash already received, without counting anything from other personal

assets not reduced to cash at the time of the settlement, thus making the total cash received by the executrix at least $21,069.32.

Of the amount which had been paid out by the executrix when she made her settlement, $853.20 was in payment of the first and second class demands, $1,000 allowed by the probate court to the widow, $376.13 for attorney fees, probate fees, etc., in connection with the administration. The small balance was for taxes and various items, probably expenses incurred by the executrix, as they were paid and credited without formal presentation as demands. It is apparent that none of the money so paid out was on debts or demands that could have existed on May 8, 1924.

Of the total amount of fifth and sixth class demands, $23,779.72, at least the sum of $4,231.45 is shown not to have been owed in May, 1924, thus: $2,730.40 on a note to E. A. Stierberger, dated February 24, 1925; $600, which was added to the $1000 note, and $288.45 added to the $3600 note to the Bank of Union after May 24, 1924, as shown above; and an item of $612.60 to the Bank of Union which must have been an additional loan made after May 8, 1924. Mr. Allersmeyer testified that his bank did loan Hilkemeyer some additional money after it knew of the transfer of the residence, and further testified that the three notes to his bank pleaded and testified to by him were all that Hilkemeyer owed that bank. It is apparent from the settlement, therefore, that of the total amount of fifth and sixth class demands not over $19,548.28 could have been owed in May, 1924, which includes interest earned from time of last prior renewals of the notes to the banks to date of their allowance as demands.

It thus appears from the semi-annual settlement that the amount of cash actually realized at date of the settlement out of the personal estate slightly exceeded the total amount of all debts of Hilkemeyer which, under the evidence, could have existed when the conveyance complained of was made, and when the $1300, which amount at least the evidence shows will yet be realized out of the estate, is added, the excess of cash realized and to be realized over such indebtedness is somewhat more than $1500. And the foregoing computation does not take into account what may be realized from other undisposed of assets, the value of which is shown only by the statutory appraisement filed by the executrix, nor another factor which should be considered in determining Hilkemeyer's financial status at the time he made the conveyance, viz.: It was shown he had then a well equipped and well stocked store and a good business, a going concern. The evidence shows and it cannot be doubted that the stock and fixtures were worth more thus than they could be expected to bring at a forced sale after his death. Such proved to be the result. The value of the stock of merchandise and fixtures was $18,200.23, as shown by the appraisement filed in the probate

court. Mr. Allersmeyer testified that that was a fair appraisement of their then value. It was probably less than would have been their reasonable market value had the owner still been alive and his store a going business. The stock of merchandise and fixtures were sold in bulk under an order of the probate court for $10,500, which latter sum only is reckoned in the total cash realized, as shown in the settlement referred to, the loss on that item, as compared with the appraised value, being $7,700.23.

From the showing made by plaintiffs' evidence we think it affirmatively appears that Hilkemeyer was not insolvent when he made the conveyances sought to be set aside and was not rendered so by the conveyances. The financial statements made by Hilkemeyer to the Bank of Union were offered in evidence by plaintiffs without any limitation or restriction as to the purpose for which they were offered. Defendants offered no objection. There is no suggestion in the evidence, nor in respondents' brief here, as to the honesty and good faith of those statements. There was no attempt to show, nor was there any suggestion made, that in the statements Hilkemeyer overvalued his properties. Offered as they were by plaintiffs and not objected to, we think the statements should be treated as evidence of the facts therein shown. Those statements show that Hilkemeyer, after making the assailed conveyance, had ample assets left with which to meet all his liabilities, including the notes on which others were primarily liable, and from whom, by the way, the evidence indicates something might be collected if a determined effort were made. There is some evidence to the effect that more could have been procured for the store real estate in 1924 than when it was sold under the deed of trust after Hilkemeyer's death, that is, that such real estate in Union was of higher value in 1924. As stated above, the evidence indicates that Hilkemeyer's holdings remained substantially the same from May 8, 1924, until his death, and the actual results in the administration of his estate, as well as the financial statements mentioned, point to the conclusion that he was not insolvent when he made the conveyances, nor rendered insolvent thereby.

We find nothing in the evidence to indicate fraudulent intent on the part of Hilkemeyer in making the conveyance unless such intent may be inferred or presumed from the facts that he was indebted at the time and that the conveyance was without consideration.

Respondents do not seem to contend that the evidence tends to show actual fraudulent intent. They state in their brief:

"When the indebtedness to plaintiffs was shown and when the voluntary conveyances were shown, those conveyances were primafacie fraudulent and void, and the burden was on appellants to prove that the conveyances were not fraudulent and that the deceased retained sufficient property to meet his indebtedness." [Cit-

ing Clark v. Thias, 173 Mo. 628, 73 S. W. 616; Lynes v. Holt, 1 S. W. (2d) 121.]

In Clark v. Thias, supra, it is held that the mere fact that a conveyance is voluntary does not render it void. The court said:

"That is a question of fact to be determined from the conditions surrounding the party at the time of making the conveyance. The true rule seems to be that if the conveyance is voluntary, the burden rests upon the party accepting the conveyance to establish the circumstances which will repel the presumption of a fraudulent intent."

Lynes v. Holt, supra, is to the same effect.

The rule as to conveyances without actual intent to defraud is well stated in Johnson v. Murphy, 180 Mo. 597, 614, 79 S. W. 909, where this court, quoting from 14 Am. & Eng. Ency. Law (2 Ed.) 301, said:

" 'The validity of voluntary conveyances as regards existing creditors is to be determined, therefore, by the answer to the inquiry: Is the donation such as a prudent man, perfectly acquainted with his financial condition, actuated by an honest purpose, and having due regard to the rights of his creditors, would have made under the circumstances? If at the time of the voluntary conveyance the donor is insolvent, the deed is fraudulent, and evidence that no fraud was intended cannot change its character. So, if the execution of a voluntary conveyance, however meritorious in itself, leaves the donor with insufficient property to meet existing liabilities, it is fraudulent and void. Or, if the donor at the time of the execution of a voluntary conveyance, though not actually insolvent, is in embarrassed circumstances which eventually end in insolvency, the conveyance is void. If, on the other hand, the donor was at the time of the voluntary conveyance perfectly solvent and retained sufficient means to pay his debts, ought the conclusion of a fraudulent purpose to be drawn from the mere fact of their existence at the time and the donor's subsequent inability to discharge them?' The author answers the question by saying, 'In some of the States it is held that the fact that the donor was solvent at the time of the conveyance is not sufficient to rebut the inference of fraud if the property donated is afterwards required to liquidate his liabilities.' And after giving the arguments pro and con on the proposition, winds up by saying, 'It is held in a majority of the jurisdictions that if the donor at the time of the gift was in prosperous circumstances and possessed ample means to pay his debts, and the gift was a reasonable one according to the purpose for which it was made, it is valid and will not be vitiated by the subsequent insolvency of the donor not produced by causes existing at the time of the conveyance.' "

Our court has followed the latter rule.

Defendant Jenny, a lawyer, was called by plaintiffs as a witness and testified that he wrote the deeds and at Hilkemeyer's request immediately filed them for record; that he had no personal interest in the transaction.

As Mrs. Hilkemeyer did not testify in her own behalf the rule invoked by respondents would apply, unless plaintiffs' evidence sufficiently shows the facts to repel the presumption of fraud that would otherwise follow from the proof that the conveyances were voluntary and were made when the grantor was indebted. Plaintiffs relieved her of that burden of proof by themselves showing the facts and circumstances relative to Hilkemeyer's business and financial situation and his conduct, which we think repel the presumption of fraud. Under the circumstances we do not regard Mrs. Hilkemeyer's failure to testify a "badge of fraud" as asserted by respondents, for the reasons above stated, and the further reason that she is not charged by pleading or evidence with participation in or knowledge of a fraudulent purpose on the part of her husband in making the conveyance or knowledge of his alleged insolvency, and therefore was not called upon to deny a charge of that nature.

In their brief respondents say that the deeds are void under Section 2275, Revised Statutes 1919, as constituting a conveyance in trust to the use of the grantor, Hilkemeyer, citing in support of this point Ebert v. Myers, 9 S. W. (2d) 1066. This seems to be an afterthought as that theory was not presented in their petition, which is apparently bottomed on Section 2276, and the trial court did not hold the deeds void on that theory. In the case cited the conveyance was to the grantor's daughter. This court held the deed voidable on other grounds, and that it was also voidable under Section 2275, supra, saying on that point:

"The evidence is uncontradicted by the parties who claim an interest that the purpose of the transfer of title to Olivia was to keep the home for their father and mother for the rest of their lives, and any of the children who wanted to live there with them. This is a conveyance to the use of the grantor. The evidence shows that it did not alter in any way the grantor's position with reference to the property, its management or control. The conveyance was therefore voidable for that reason."

In one of the cases cited as authority in Ebert v. Myers, supra, McFarland v. Bishop, 282 Mo. 534, 551, 222 S. W. 143, Graham conveyed property to a trustee to hold and manage, pay the income, after discharging grantor's existing debts, to the grantor during his life, and then to distribute the property among his children. The court said:

"It may be admitted that this section (2275 supra) makes the conveyance, so far as it is to the use of Graham, null and void as to creditors and purchasers. But the statute does not make it null and void, even as to creditors and purchasers, so far as it is for the use and benefit of Graham's children."

In 27 Corpus Juris, 601, it is said:

"Neither the statutes nor the common-law principle have any application to cases in which the conveyance is made for the real and actual use of the grantee, and any reservation to the grantor is merely incidental" citing among other cases, McFarland v. Bishop, supra.

It is also stated in 27 Corpus Juris, 599:

"The effect of a reservation of an interest for the grantor's benefit depends to a great extent upon the character of the instrument. A reservation which results from the nature and character of the transfer and which, whether expressed or not, the law operating upon the transfer would confer, is not as a general rule to be deemed the reservation of a benefit rendering the transfer fraudulent."

If respondents' contention that a transaction, whereby real estate owned by a married person is transferred to himself or herself and spouse so as to create a tenancy by the entirety, is a conveyance in trust to the use of the grantor within the contemplation of Section 2275, supra, is correct, then every such estate, so created, would remain subject to the claims of existing *and subsequent* creditors of the grantor, regardless of the grantor's solvency or insolvency at the time of the transfer or his or her purpose in making it. We think Section 2275, supra, does not apply in this case.

In our opinion the evidence in the case does not warrant setting aside the deeds in question. The judgment, therefore, is reversed. *Davis* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.

## ON MOTION TO MODIFY OPINION

PER CURIAM:—Respondents have filed motion asking the court to modify the opinion in this cause so as to reverse and remand the cause instead of reversing outright; alleging that on another trial they can produce sufficient proof that L. G. Hilkemeyer was insolvent at the time of making the conveyance complained of. We have concluded the respondents should be given opportunity to produce such proof if available. The motion to modify is sustained and the opinion is modified by adding thereto, after the concluding words "the judgment, therefore, is reversed" the following, to-wit:

"And the cause remanded for new trial," so that the concluding sentence of the opinion shall read "The judgment, therefore, is reversed and the cause remanded for new trial." All of the judges concur.