BEN F. MAYS v. T. E. JACKSON, Appellant.—145 S. W. (2d) 392.

Division One, December 11, 1940.

*Carl E. Williamson* for appellant.

*George M. Booth* and *Chas B. Butler* for appellee.

DALTON, C.—This action involves title to one acre of improved real estate in Ripley county. The petition is in two counts. The first seeks to establish a resulting trust and to have title divested from defendant and vested in plaintiff. The second count is in ejectment to recover possession of the premises. Both counts, one in equity and one at law, were tried before the court in one hearing, without the aid of a jury, and judgment was entered on each count for plaintiff. After motion for new trial had been filed and overruled, the defendant appealed.

The abstract of the record sets out the original petition and recites that the petition was subsequently amended to show that an agreement therein mentioned was an "oral contract." The amended petition is not set out. There is a recital that defendant demurred to the *petition* (counts not mentioned) on the ground that it did not state a cause of action. The demurrer is not set out. There is a recital that the demurrer was overruled and defendant filed an answer and plaintiff replied thereto, but the answer and reply are not set out. There is no reference in the abstract of the record to the content of either the answer or reply. Appellant does not assign error on the court's action in ruling the demurrer. Instead, error is assigned on the court's action "in admitting any evidence to support the plaintiff's *petition* for the reason that the *petition* is fatally defective and wholly inadequate in that it does not state a cause of action." (Italics ours.) The record fails to show that any such objection was made at the trial. The matter, therefore, is not properly before us for review.

Assuming, however, that the amended petition was like the original petition, except that the word "oral" was added immediately before the word "agreement," the first count alleges that one Pierce owned the particularly described real estate; that plaintiff desiring to purchase said real estate orally agreed with defendant to purchase the same from Pierce; that it was orally agreed that title be taken in defendant's name "until such time that plaintiff should demand said lands to be conveyed by defendant to plaintiff;" that plaintiff paid to defendant the sum of $75 for the purchase price thereof; that said purchase price was paid by defendant to Pierce; that the premises were conveyed by Pierce to defendant; that plaintiff "assumed ownership," built a filling station and a barn, drilled a well and equipped the station with tanks and pumps; that plaintiff demanded a deed to get record title; that defendant refused to convey to plaintiff; that defendant's deed is a cloud on plaintiff's title and the record of the deed a fraud on plaintiff; and that plaintiff has no adequate remedy at law. The prayer is that the record

title to said real estate be divested from defendant and vested in plaintiff and for other relief. The second count, in ejectment, is in the usual form. It is not mentioned in appellant's brief.

█ Appellant contends that plaintiff's suit is based on an oral contract purporting to set up an express trust; that a resulting trust can never be the result of an agreement; and that the contract is void by reason of Sec. 3104, R. S. 1929, 3 Mo. Stat. Ann. 1928. The record does not show that said section was pleaded as a defense, but the record does show that appellant objected to testimony as to the alleged agreement "unless the same was in writing."

We think it is apparent that the first count was not intended as a suit for specific enforcement of an oral contract to convey land; nor as a suit to enforce an oral trust. The ultimate facts stated are that defendant, acting for and on behalf of plaintiff, purchased the real estate for plaintiff with funds furnished by plaintiff for that purpose and, in accordance with directions of plaintiff, took title in defendant's name for plaintiff; that plaintiff assumed ownership and made and paid for the improvements; that defendant refused to transfer the legal title to plaintiff on demand; and that the deed to defendant is a cloud on plaintiff's title.

In our opinion the first count of the petition states facts sufficient to constitute a cause of action for a resulting trust. [Scott v. Ferguson, 235 Mo. 576, 579, 139 S. W. 102; Butler v. Carpenter, 163 Mo. 597, 605, 63 S. W. 823.] The parol agreement alleged merely tends to show the relationship of the parties and the character of the transaction, while the resulting trust sought to be established would arise from the ultimate facts alleged, to-wit, that the consideration was paid by plaintiff and the deed taken in the name of defendant. [Laughlin v. Laughlin, 291 Mo. 472, 479, 489, 237 S. W. 1024; Richardson v. Champion, 143 Mo. 538, 545, 45 S. W. 280.] Even if there had been an express trust declared by parol, which was invalid and unenforceable by reason of Sec. 3104, supra, this fact alone would not prevent a trust from resulting by operation of law from the acts of the parties. [Condit v. Maxwell, 142 Mo. 266, 274, 44 S. W. 467; Sec. 3105, R. S. 1929, 3 Mo. Stat. Ann. 1931.]

In stating the facts, we shall refer to the parties as plaintiff and defendant. Plaintiff's evidence tends to show that plaintiff was an agent and distributor for the Sinclair Refining Company; that he resided at Pocahontas, Arkansas; that defendant operated a filling station in Arkansas and purchased products from plaintiff; that defendant's location was not desirable; that defendant wanted a location over the state line in Missouri but he had no funds with which to purchase a location; that plaintiff and defendant had various conversations about the matter over a period of months; that a new location on the land of one Pierce was agreed upon as suitable; that defendant said to plaintiff: "Now Mr. Pierce will sell me this

land up here but I don't have the money to buy it. I could buy it and if you will put up the money to buy it, I will buy the land for you, taking the deed in my name and reconvey the land to you." Defendant said that Pierce was afraid anyone else would sell whiskey or beer on the premises. It was orally "agreed" between plaintiff and defendant, that plaintiff "would buy the premises and pay for it, and erect a building;" and that the defendant "should have the privilege of paying for it later." Defendant also said to plaintiff "I will make the deal with Mr. Pierce and take the deed in my name, then I can give you a mortgage on the property and pay it out by monthly payments, and if I can't do that I will make you a deed to the premises back." Plaintiff's evidence indicates an understanding between the parties to the effect that plaintiff would buy the land and pay for it, build the necessary improvements and pay for them; that defendant would act for plaintiff in making the purchase and take title in his own name for plaintiff; and that defendant would then have the privilege of buying the premises on reasonable terms and paying the purchase price in installments and· that if he couldn't pay for the property he would clear plaintiff's title by executing a deed to plaintiff. However, in none of the conversations related was any price fixed or any method of ascertainment of a price specified. The amount of installments and the detailed terms of payment were not discussed. Defendant was merely to have "an opportunity to buy the premises and pay for it after the building was completed." If he couldn't make reasonable monthly payments he was to give back to plaintiff the title he had taken in his own name for plaintiff. No rental proposition was discussed.

Defendant saw Pierce and arranged for the purchase of the proposed premises, one acre, for the price of $75. He advised plaintiff as to the terms and plaintiff gave him $75 to pay Pierce for the land. The payment to defendant was made as follows: Defendant bought a cow and calf from plaintiff for $45. He had the money to pay for them but he didn't pay it over, just kept the money, and plaintiff gave him $30 in currency "and the $45.00 he owed for the cow and calf." The $75 was to be paid to Pierce for the land. It is further stated that defendant advised plaintiff he had the $45 to pay for the cow and calf, but he didn't have the rest, and he needed the money to pay Pierce. Accordingly defendant kept the $45 and plaintiff gave him $30 in cash so the purchase price could be paid. The money was not repaid to plaintiff. At another place in the record under the head "Appellee testified," plaintiff's testimony is narrated as follows: "He authorized appellant to buy the acre of ground for him and first gave appellant $45.00 to pay for the land, and after appellant got a deed to the land in November, he gave appellant $30.00 more to finish paying for the land in December 1935." The testimony is not before us in question and answer form, nor is it

narrated in the first person, but, as above, giving the narrator's conclusions as to the testimony.

When the deed was delivered to defendant, plaintiff let a contract for hauling sand, gravel and rock for the proposed building. Plaintiff and defendant discussed the plan of the building before construction began and both parties cooperated in building the building, but plaintiff paid all of the bills. In cases where the workmen were indebted to defendant, plaintiff made the checks to defendant, and let defendant pay the workmen and hold out of each man's wages the amount that each owed to defendant. Defendant supervised much of the work, but plaintiff paid all of the bills for all labor and materials, including payment for defendant's labor. A barn was built on the premises and plaintiff paid for all labor and materials, including defendant's labor, and that of his son, at $1.50 per day. Some workmen to help on the improvements were secured on the basis that they would trade out the amount of their work with defendant and, in such cases, plaintiff paid over the money to defendant. One Williams was secured to drill a well on the premises, the cost was $50, and plaintiff paid this amount by crediting defendant's account for gasoline purchased by the defendant from plaintiff, and defendant paid Williams by crediting an account which Williams owed to defendant and by letting Williams buy gasoline from defendant at plaintiff's direction.

After the station was finished plaintiff purchased two tanks, two pumps, an air compressor and a small gasoline engine, and paid for it and for its installation. Checks were produced and offered in evidence to show the date and amount paid to numerous individuals for materials, labor and equipment. Plaintiff claimed he had a record of all money paid out on the property and the receipts for all sums so paid out. A memoranda of all payments made during the progress of the work was introduced in evidence.

The station cost plaintiff $1600, and the equipment $250. There were other items, including $10 which plaintiff furnished so that a small cream station on the premises, which had been reserved by Pierce, could be purchased.

When the improvements were finally completed the defendant took possession. Thereafter, the parties were not able to agree upon a price, and plaintiff demanded a deed from defendant, but defendant claimed his wife would not sign the deed. Later, the parties agreed on a price of $1850 for the entire property, including the equipment, and defendant was to rent the oil station rights to a third party for $35 per month, assign the rental to plaintiff, and further to pay the plaintiff $15 per month, making a total payment of $50.00 per month on the property. The purchase price of the property, exclusive of equipment, was to be evidenced by thirty-two $50 notes secured by deed of trust on the premises. These agreements were not in

writing and were not carried out by defendant. Later, defendant would not even talk to plaintiff about the matter, and plaintiff brought this suit.

Plaintiff denied that any oral agreement was made whereby defendant was to pay him for the premises by paying him one cent per gallon on gasoline sold on the premises. He admitted that at one time there had been a rental agreement for one cent per gallon, but claimed he had not received any money from defendant on that basis. He denied that he had loaned defendant any money, but claimed that he had extended credit to defendant for gasoline by paying the bill and charging the amount back to defendant on occasions when defendant didn't have the money to pay for the gasoline delivered. Plaintiff claimed he did not advance any money which defendant was to repay later. He said, that according to their oral arrangement, defendant was to make a deed to him and he was to sell to defendant on a reasonable monthly payment basis. Plaintiff also claimed that defendant had acknowledged to him, after the building was finished, that the building belonged to plaintiff and that defendant didn't deed it over because his wife wouldn't sign the deed.

Witness Benbrook testified that he was present when defendant said to plaintiff that he wanted to buy the station; that defendant agreed to assign the $35 per month rental from the oil station to plaintiff to apply on the purchase price; and that at that time plaintiff said he wanted the assignment in writing.

Witness Halton testified that he was present when defendant agreed to pay plaintiff $1850 for the station complete; that defendant said he could get $35 per month rental on the property; and that he would turn that money and an additional $15 per month, to plaintiff until the purchase price was paid.

Witness McDaniels, who installed the pumping equipment, testified that he asked defendant where he wanted the pumps located and defendant said to wait and see plaintiff, because plaintiff owned the property. McDaniels testified that he was present when defendant told plaintiff "that a bunch had been talking to his wife and he could not get her to sign the deed; that he would wait a few days and talk to her." Witness further quoted plaintiff as saying to defendant "I went ahead and furnished the money and materials and you was to make me a deed to it."

Witness Johnson testified that on one occasion he noticed "the station was not beaded." He asked defendant about having the work done, and defendant advised him to see plaintiff. Defendant said that plaintiff built the building and owned it.

Witness Redwine testified that defendant said to him at the station one day, "Mr. Mays is building this place for me."

Witness Walter Jackson testified that defendant told him that he (defendant) and plaintiff "never could come to any conclusion;"

that he never did think plaintiff had as much in the place as he claimed; and that plaintiff claimed to have about $1800 in the place. Defendant said he bought the land and plaintiff built the building. Witness also testified that he delivered gasoline for plaintiff to defendant and that defendant did not pay a cent a gallon extra on the gasoline and that witness had collected no rent from defendant.

Witness Dalton testified that defendant advised him that plaintiff had built the place and that he was to pay plaintiff a cent a gallon, but plaintiff had not collected except on one occasion. Witness then asked defendant what kind of a lease he had and defendant said he couldn't present his lease; that he would like to get the property in his name so that he could get gasoline from witness out of the Doniphan district and get it handled quicker.

Defendant's evidence tended to show that while he was operating a filling station in Arkansas, the plaintiff suggested that business would be better in Missouri; that defendant purchased the acre of land from Pierce and paid for it himself and took a deed to himself; that he later bought a small building on the property that Pierce had reserved; that, when he bought the land, a mortgage company wanted $50 to release the acre tract; that he didn't have the money and he borrowed it from plaintiff and paid the agent of the loan company; that he paid the remaining $25 to Pierce out of his own money; that he further paid $5 out of his own funds to get a lease of the property released; that on January 11, 1936, he repaid plaintiff the $50 loan by a check which was endorsed and cashed by plaintiff; that plaintiff advanced him sums of money with which to construct the building on the premises; that he was to repay plaintiff at the rate of one cent per gallon on gasoline sold; that this agreement was made after the land was purchased and the building had been constructed; that he was in possession of the premises and running both a grocery store and a filling station on the premises; that plaintiff never did tell him what balance was due; that at different times he had asked plaintiff for a statement, which plaintiff promised to furnish, but never furnished; that he figured it up himself, and from what he knew and from what plaintiff had told him, he fixed the amount at $1008; and that he had prepared a memorandum showing what he (defendant) had paid out in the construction of the building.

Defendant further testified that he had sold 32,036 gallons of gasoline from the station over a period of one year and had paid plaintiff $320.36, a cent a gallon on the gasoline sold, but plaintiff refused to take any further payments; that he quit taking gasoline from the plaintiff because plaintiff over-charged him; that he didn't know plaintiff claimed the place until January, 1937; that he paid for drilling the well; that he built a barn and furnished the materials; that part of the lumber came from his old station in Arkansas; that

he had not made the statements testified to by Halton and Benbrook; that he had wanted to finish paying plaintiff the balance he owed him by turning over $35 per month rental to plaintiff but plaintiff insisted on $50 per month; that he had then told plaintiff that he would finish paying him at one cent per gallon according to the original agreement; that when he had asked plaintiff how much he (plaintiff) had been out that plaintiff raised the figure from $1250 to $1800; that he refused to pay plaintiff $1800; that he offered to make plaintiff a deed to the place, if plaintiff would make him a contract showing what plaintiff had in the property and how and when he (defendant) was to pay it; that no mortgage was ever given but he offered to give one to plaintiff, and plaintiff refused it; that he didn't tell any one the property belonged to plaintiff; that the station was worth about $1000; that, although plaintiff had furnished about $1008 that went into the station, he had been paid $320.36; that he (defendant) had no receipts for the payments to plaintiff, but only the invoices showing the gasoline used; that plaintiff told him that was enough; that McDaniels, Benbrook, Redwine, Halton and Johnson were "wrong on their testimony," and mistaken; that he did not pay Walter Jackson a cent a gallon when Jackson was delivering for plaintiff; that he didn't tell Dalton that plaintiff owned the property; that the payments to plaintiff of one cent per gallon, on gasoline used, was paid in money, and extra above the invoice price, on the number of gallons that went into the tanks; that when he paid for the gasoline he paid plaintiff an extra cent a gallon; that he asked for a receipt and plaintiff said the invoice was a receipt; and that he knew he was paying plaintiff more than the invoice price.

Witness Willis Jackson, a brother of defendant, testified he heard a conversation between plaintiff and defendant, and plaintiff said he had an arrangement whereby defendant was to pay him a cent a gallon on gasoline; and plaintiff asked witness if he thought that was too high. Witness further testified that used pumps cost $40 each complete, two tanks $62 and an air compressor from $10 to $65.

Witness Raymond Jackson, a brother of defendant, testified that when the work started on the building plaintiff told witness and Willis Jackson that defendant was to pay for the building by paying one cent a gallon on gasoline he sold and said that, if that was too high, he would let witness and Willis Jackson fix the rate of payment. Witness knew plaintiff was helping construct the building.

Witness Robinson, a carpenter, estimated that in view of prices in 1935, the building should not have cost over $704, exclusive of hauling sand and gravel and excluding oil station equipment. Witness Williams testified that he drilled the well for defendant; and that plaintiff talked to him about the well, but he didn't know plaintiff "had anything to do with it." Witness Venable, a nephew of

defendant, testified that he worked on the barn with one Claude Rush and that defendant paid them. Witness Carroll testified that plaintiff told him that defendant was to pay him a cent a gallon on the gasoline he sold; that witness worked 18 to 20 days in the construction of the building; and that defendant paid him $1 per day. Witness Pierce testified that defendant paid him with a $50 check in October, 1935, and that, when the deed was made, defendant paid an additional $25.

In rebuttal, plaintiff denied that defendant paid him a cent a gallon on gasoline when he delivered gasoline. He said defendant paid the regular price and that the sales slips showed what he (plaintiff) received. He admitted he talked to Willis and Raymond Jackson about an agreement of defendant to pay a cent a gallon and told them that, if defendant could not pay for the station, he would rent it to him. He said the check of January 11, 1936, given by defendant was in payment of a balance due for gasoline purchased by defendant.

In an equity case we are not bound by the findings of the chancellor but review the evidence *de novo,* determine its weight and value, and reach our own conclusions. We usually defer to the chancellor's findings unless satisfied that "the proof adduced is palpably insufficient to sustain the findings or there is a strong preponderance of evidence to show that the court should have found to the contrary." [Daudt v. Steiert (Mo.), 205 S. W. 222, 225.] It is, therefore, important that we have all of the evidence which was before the trial court, including all exhibits, and that the evidence be presented in a form that can be understood. [Bueker v. Aufderheide, 345 Mo. 833, 136 S. W. (2d) 281.] The record in this case shows that a number of exhibits were offered in evidence but none are set out in the record. We have only the testimony of the witnesses with reference to the exhibits but not the exhibits themselves. Appellant has narrated the testimony of the witnesses but not in the first person. It is in the form of a statement about the testimony of the witnesses. (See quotation from plaintiff's testimony, supra.) In some cases it is difficult to determine just what the witnesses said.

Error is assigned on the court's action in overruling the demurrer to the evidence offered at the close of plaintiff's case and at the close of all the evidence. The argument is to the effect that the evidence was insufficient to establish a resulting trust. "A demurrer to the evidence . . . fills no such office in an equity case that error can be predicated on the mere giving or refusing of it." [Troll v. Spencer, 238 Mo. 81, 94, 141 S. W. 855, 858; Conrad v. Diehl, 344 Mo. 811, 816, 129 S. W. (2d) 870, 873.] The assignment is overruled.

Error is assigned on the court's action in refusing certain declarations of law with reference to the law of resulting trusts.

Declarations of law have no place in equity proceedings. [Stillwell v. Bell, 248 Mo. 61, 64, 154 S. W. 85; Schibel v. Merrill, 185 Mo. 534, 550, 83 S. W. 1069, 1074.] The assignment is overruled.

■ Error is assigned on the court's action "in admitting, over defendant's objection, incompetent, prejudicial, immaterial and irrelevant testimony on the part of the plaintiff to undertake to establish, by parol, an express trust." The particular evidence objected to is not pointed out. The point is not briefed under points and authorities or in argument and may be considered abandoned.

■ Error is assigned on the court's action in finding for plaintiff. Appellant's brief and argument deal essentially with the question of the sufficiency of the evidence to establish a resulting trust. The count in ejectment, the evidence in support thereof, and the part of the judgment thereon, are not referred to. Appellant insists that the decree should have been for the defendant; that a resulting trust was not established by clear, cogent, positive, and convincing evidence; and that "a resulting trust arises by operation of law from the facts in the case and never by operation of any agreement; from what the parties do, and never what they agree to do." [Ebert v. Myers, 320 Mo. 804, 808, 9 S. W. (2d) 1066; Parker v. Blakeley, 338 Mo. 1189, 1201, 93 S. W. (2d) 981; Bender v. Bender, 281 Mo. 473, 477, 220 S. W. 929, 930; Thompson v. Thompson (Mo.), 211 S. W. 52, 56.] Appellant says that, if there was a resulting trust "it arose at the instant the deed was taken" and could not "be created by subsequent occurrences."

In order to establish a resulting trust by parol evidence the proof must be so clear, cogent, positive and convincing as to exclude every reasonable doubt from the mind of the chancellor. [Norton v. Norton (Mo.), 43 S. W. (2d) 1024, 1032.]

It is conceded that the rule is that "an express trust cannot be created or proved by a parol agreement; a resulting trust may be proved by parol, but never arises by virtue of an agreement." [Woodard v. Cohron, 345 Mo. 967, 137 S. W. (2d) 497, 498.]

Respondent, however, does not rely on any parol agreement to establish a resulting trust, but upon the fact that plaintiff was the purchaser of the real estate and paid the purchase price and the deed was taken in the name of the defendant. Scott v. Ferguson, supra. The alleged oral agreement amounts to little more than an expression of an intention that defendant was to act for plaintiff in purchasing the real estate for plaintiff with plaintiff's money and was to take the deed in defendant's name. Although there are expressions in evidence to the effect that the defendant was to have an opportunity to purchase the property from plaintiff after plaintiff improved it, no price and no terms were agreed upon. The first count of plaintiff's petition is not based upon defendant's alleged agreement to deed the property over to plaintiff, but upon the fact that plain-

tiff paid the purchase price of the real estate, and that there is nothing to show an intention that no trust result in plaintiff's favor. [65 C. J. 366, sec. 141.] The alleged agreement does tend to show the relationship of the parties and the character of the transaction but no oral agreement is relied upon to either create or prove, a resulting trust.

Appellant makes much of the fact that at one place in the record plaintiff apparently said the $30 was paid after the delivery of the deed to defendant while, at another place in his testimony, he said that defendant didn't have the money and he paid it all to defendant before defendant could make the purchase for him. On plaintiff's theory of the case it makes little difference which is correct. Even if defendant purchased the land for plaintiff and advanced part of the money on plaintiff's behalf and secured the deed in defendant's name for plaintiff and if defendant looked to plaintiff for reimbursement of the amount advanced to plaintiff and if defendant was paid by plaintiff there would still be a resulting trust in plaintiff's favor. The same is true, if defendant used his own credit in plaintiff's behalf. [Scott v. Ferguson, supra, 235 Mo. 576, 582, 139 S. W. 102; Clowser v. Noland, 133 Mo. 221, 34 S. W. 64; Wrightsman v. Rodgers, 239 Mo. 417, 428, 144 S. W. 479; 2 Restatement, Law of Trusts, sec. 448; 2 Bogert, Trusts & Trustees, sec. 456.]

Plaintiff's evidence, if believed, was entirely sufficient to satisfy all applicable rules and to establish a resulting trust. [Price v. Rausche (Mo.), 186 S. W. 968, 970; Bowen v. McKean, 82 Mo. 594, 598; Baumgartner v. Guessfeld, 38 Mo. 36, 41; 2 Restatement, Law of Trusts, sec. 440; 2 Bogert, Trusts & Trustees, sec. 455.]

The evidence is conflicting and the facts for the most part lie in parol, but plaintiff's testimony in many respects is corroborated by his witnesses. It is difficult to believe defendant's evidence to the effect that plaintiff was furnishing the money to defendant and that the method and manner of repayment was not discussed until the building was constructed. It is also difficult to accept defendant's evidence in some other respects. It is apparent that the trial court believed plaintiff's evidence and rejected that of defendant. The trial court was in a much better position than we are to determine the credibility of the witnesses. In addition, we do not have the entire evidence before us, nor is the evidence presented in such a form that its meaning is entirely clear. We have reached the conclusion that under all the circumstances of this case we should defer to the findings of the trial court and affirm the judgment. The judgment is affirmed. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.